IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CHRISTINE BORDEAUX,<br><br>Plaintiff,<br><br>vs.<br><br>CHERYL BICKNASE, in her official and individual capacities; OFFICER BOWLES, in his official and individual capacities; JEANIE GOLLIDAY, in her official and individual capacities; ANGELA FOLTS, in her official and individual capacities; DENISE DAVIDSON, in her official and individual capacities; and DOES 1 - 10, in their official and individual capacities;<br><br>Defendants. | Case No. 4:18-cv-3122<br><br>**COMPLAINT, JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL** |

Christine Bordeaux, by and through her counsel of record, for her cause of action against Defendants, states as follows:

**PARTIES, JURISDICTION AND VENUE**

1.

Christine Bordeaux is an inmate committed to the custody of the Nebraska Department of Correctional Services (NDCS). She is currently housed in an out-of-state correctional facility by agreement of NDCS with that state's receiving facility.

2.

Defendant Cheryl Bicknase ("BICKNASE") was, at all relevant times, a Unit Caseworker at the York Correctional Center for Women ("YCCW"), employed by the Nebraska Department of Correctional Services ("NDCS"). She is liable for her actions in her individual and official capacities.

All actions undertaken by BICKNASE constituted actions under color of state law.

3.

Defendant OFFICER BOWLES (first name currently unknown) was, at all relevant times, a correctional officer at YCCW, employed by NDCS. He is liable for his actions in his individual and official capacities. All actions undertaken by OFFICER BOWLES constituted actions under color of state law.

4.

Defendant Jeanie Golliday ("GOLLIDAY") was, at all relevant times, a classification officer at YCCW, employed by NDCS. She is liable for her actions in her individual and official capacities. All actions undertaken by GOLLIDAY constituted actions under color of state law.

5.

Defendant Angela Folts ("FOLTS") was, at all relevant times, a correctional officer at YCCW, employed by NDCS. She is liable for her actions in her individual and official capacities. All actions undertaken by FOLTS constituted actions under color of state law.

6.

Defendant Denise Davidson ("DAVIDSON") was, at all relevant times, the Warden of the York Correctional Center for Women, She is sued in her individual and official capacity. All actions undertaken by DAVIDSON constituted actions under color of state law. DAVIDSON was the policymaker and final decisionmaker for the YCCW at all relevant times, and was responsible for articulating, training, and ensuring compliance with official and unofficial policies for the protection of inmates and any other person inside the secured area of the facility.

7.

DOES are and/or were employed by the Nebraska Department of Correctional Services as

correctional administrators, supervisors and/or officers at all relevant times. All of these individual DOE Defendants are liable for their actions in their individual and official capacities. All actions undertaken by any and all of the DOE Defendants constituted actions under color of state law.

8.

This action is brought pursuant to the provisions of 28 U.S.C. §§1331 and 1333 and 42 U.S.C. §1983. The proper venue for this action is the United States District Court for the District of Nebraska because the acts and omissions complained of herein occurred in York, York County, Nebraska.

**INTRODUCTION**

9.

The York Correctional Center for Women, operated by NDCS, is Nebraska's only secure correctional center for women. It houses maximum, medium and minimum custody adult female inmates. It is located outside of York, Nebraska in York County. Its housing units include a Diagnostic & Evaluation unit, where all new inmates are assessed for security, safety and medical needs; North Hall and Bay Hall, which are general population units; and special management units including the Restricted Housing Unit and Protective Custody.

10.

As Warden of YCCW, DAVIDSON is responsible for overseeing the incarceration, supervision and safety of inmates in the facility. This responsibility includes the responsibility to understand and identify risks to inmate safety and to take reasonable measures, proactively, to prevent those risks from erupting in reality. This responsibility includes the responsibility to understand and identify risks to inmate safety and to take reasonable measures, proactively, to prevent those risks from erupting in reality. NDCS Administrative Regulation 116.01, "Inmate

Rights," provides that inmates shall have the right to a healthy environment, to include adequate supervision in all living units, and "a safe environment" in which inmates are protected from personal abuse.

11.

Defendants, and each of them, knew before September 29, 2016 that a serious risk to inmate safety is presented when a prison fails to keep separate an inmate who has been a cooperating witness against another inmate, from the inmate (and associates) against whom she provided such cooperation.

12.

The responsibility to separate inmates who have been cooperating witnesses from inmates against whom they provided such cooperation is shared among multiple administrative and correctional staff positions:

* DAVIDSON, as Warden, is advised when NDCS takes custody of an female inmate who either has been a cooperating witness or who presents a threat to a cooperating witness.

* GOLLIDAY, as Classification Officer, is also so advised, and in her classification decisions (which are subject to DAVIDSON's approval), considers whether inmates either have been a cooperating witness or present a threat to a cooperating witness.

* BICKNASE, as a Unit Caseworker, and correctional officers BOWLES and FOLTS, are also so advised. They are responsible for taking reasonable measures to keep separate inmates who either have been a cooperating witness or present a threat to a cooperating witness.

13.

The need to protect the safety of inmates who have been cooperating witnesses has long been understood within NDCS and YCCW. Law enforcement and prosecutors need the proactive cooperation of correctional facilities in order to respond to concerns of potential cooperating

witnesses that if they cooperate with an investigation or prosecution, they will be at risk of injury or death when they are in NDCS custody.

14.

That YCCW is the only secure correctional facility for female inmates is not an excuse for failing to keep separate inmates who have been cooperating witnesses from inmates against whom they have provided cooperation. If YCCW cannot keep such inmates separate via housing assignments and other measures available within the facility, then YCCW and NDCS must transfer one or both inmates to facilities in other states.

15.

Defendants, and each of them, knew before September 29, 2016 that the failure to keep separate inmates who have been cooperating witnesses from inmates against whom they have provided cooperation causes an ongoing, constant and substantial risk of serious and avoidable pain, suffering, injury and potentially death to YCCW inmates. That in turn creates a disincentive for witnesses facing incarceration to cooperate with law enforcement and prosecutors, and disrupts the efficiency and effectiveness of investigations and prosecutions.

### THE 2013 MURDERS, AND BORDEAUX'S COOPERATION WITH LAW ENFORCEMENT AND PROSECUTORS

16.

In August 2013, BORDEAUX and her cousin, Erica Jenkins, lured two men to a park in Omaha, Nebraska with what BORDEAUX believed to be the intent to rob them. Erica Jenkins' brother, Nikko Jenkins, shot and killed both men. BORDEAUX is a cousin to Erica Jenkins and Nikko Jenkins.

17.

Thereafter, BORDEAUX was present with Erica Jenkins, Nikko Jenkins and another relative, Warren Levering, when Nikko Jenkins shot and killed Andrea Kruger, after which Nikko Jenkins and Warren Levering stole Ms. Kruger's vehicle.

18.

When law enforcement identified potential suspects in these murders and related crimes, BORDEAUX was charged with terroristic threats, theft, and conspiracy to commit a Class II felony. Facing up to 35 years in prison, BORDEAUX agreed to cooperate with law enforcement and the State of Nebraska by providing information and testimony in the investigation of these murders. She submitted to multiple investigatory interviews in which she incriminated herself and others. BORDEAUX then provided testimony that led to the conviction (and eventual death sentence) of Nikko Jenkins, as well as testimony leading to the conviction of other members of Nikko Jenkins' family, to include Erica Jenkins.  Warren Levering pleaded "no contest" in order to avoid trial at which BORDEAUX would have testified as a witness for the State of Nebraska.

19.

BORDEAUX's chief disincentive to cooperate with the investigation and prosecution of the 2013 murders was concern for her safety.  Many Jenkins family members (including associates of the Jenkins family) have known histories of violence.  BORDEAUX worried, and reasonably so, that she would be at risk for retaliation by Jenkins family members, particularly including any female members and associates of the Jenkins family who would be housed in the correctional facility where BORDEAUX would ultimately serve time.

20.

BORDEAUX knew that in a correctional setting, she would have nearly zero ability to protect her own safety.  She expressed her concerns to the law enforcement officers and/or

prosecutors with whom she was working in the course of her cooperation. On information and belief, the Office of the Douglas County Attorney communicated with NDCS regarding BORDEAUX's cooperation and resultant risk of retaliation by Jenkins family members and associates. In finalizing her decision to fully cooperate with the investigation and prosecution by testifying as needed, BORDEAUX accepted the assurances that she would be kept separate from, and safe from, Jenkins family members and associates. During her pretrial detention in Douglas County, BORDEAUX was successfully kept separate from Jenkins family members.

21.

Following the conclusion of her cooperation, BORDEAUX was sentenced to a combined 20 years for criminal conspiracy and attempted robbery. She was committed to NDCS custody on March 15, 2016. She was transported to YCCW, was classified and was given a housing assignment in general population, in North Hall.

### ERICA JENKINS

22.

For her role in the 2013 murders, Erica Jenkins had been sentenced on November 6, 2014 to life in prison plus 40-60 years, and was committed to the custody of NDCS.

23.

The life sentence was not Erica Jenkins' first time in NDCS custody. She had served five years at YCCW from 2006-2011, pursuant to a sentence for robbery and possession of cocaine with intent to deliver. During her prior incarceration at YCCW, Jenkins was violent and disruptive. She was not granted parole, but served time until her mandatory discharge date. Jenkins' behavior during her 2006-2011 sentence was documented by YCCW staff and administrators, and was known to Defendants, and each of them, when Jenkins was committed to NDCS custody in 2015 for her life

sentence.

24.

GOLLIDAY, as a Classification Officer, had access to substantial and credible information regarding Jenkins' history of violence. GOLLIDAY knew that Jenkins' history of violence included violence within the correctional setting, as Jenkins had thrice been convicted of assaulting correctional officers while in pretrial detention awaiting resolution of her 2013 criminal charges; on information and belief, there were other assaults committed by Jenkins in the correctional setting on other inmates/detainees. GOLLIDAY knew that Jenkins was aggressive, violent, manipulative and deceitful. Nevertheless, GOLLIDAY classified Jenkins for general population without restrictions, and Jenkins was placed in the North Hall housing unit.

25.

Similarly, BICKNASE knew Jenkins from her first incarceration at YCCW, and knew Jenkins' history of violence, the problems YCCW had had managing Jenkins in her prior incarcerations, and the risks Jenkins presented to inmate safety.

26.

BICKNASE, GOLLIDAY and FOLTS also knew that BORDEAUX had been a cooperating witness against Jenkins; so did the other Defendants, and each of them. Yet when BORDEAUX was transported to YCCW after sentencing, she was also placed in the North Hall housing unit. On information and belief, BICKNASE, GOLLIDAY and FOLTS participated in this decision, with DAVIDSON's review and approval.

27.

BORDEAUX did not have a history of violence against officers or inmates/detainees, or of retaliation against cooperating witnesses. Her classification for general population was appropriate,

but Jenkins' classification for general population was not – especially after BORDEAUX arrived at YCCW. At the very least, Defendants should have moved Jenkins into a different housing unit. They did not.

28.

Upon her arrival at YCCW, BORDEAUX was asked by YCCW staff whether she would be having problems with Jenkins. BORDEAUX responded that she wouldn't have problems with Jenkins and would not start violence, but that Jenkins would likely have problems with her. BORDEAUX was well aware of Jenkins' history of violence and that Jenkins had committed assaults during pretrial detention, and she did not want to provoke Jenkins or any of Jenkins' associates in any manner.

29.

Given her lengthy sentence and Jenkins' life sentence, BORDEAUX did not want to immediately seek protective custody to avoid Jenkins. Protective custody is a highly restrictive environment with a paucity of available privileges (such as the privilege of seeing her children) and programs (including programs to advance her eligibility for work release and parole). It is not a place to serve a 20-year sentence to avoid a dangerous inmate whom STATE has allowed to remain in general population, unrestricted. Moreover, if inmates seek protective custody in advance of an assault, it is often assumed that they did so because they are snitching on another inmate – which exposes them to the risk of assault when they leave protective custody. BORDEAUX resolved to do her best to avoid conflict with Jenkins and Jenkins' associates in general population so that she could maintain eligibility for family visit privileges and for programs to advance her parole eligibility, and so that other inmates would not assume she was currently snitching.

30.

Between March 16 and September 29, every Defendant knew that YCCW was not keeping BORDEAUX separate from Jenkins. YCCW had taken zero measures to protect BORDEAUX from Jenkins, other than to ask BORDEAUX if she had problems with Jenkins upon BORDEAUX's admission to YCCW.

## THE ASSAULT

31.

A few days before September 29, 2017, Jenkins sought and obtained approval to move into BORDEAUX's cell in C-Wing of North Hall. On information and belief, it was BICKNASE who granted Jenkins' request. BICKNASE did not consult with BORDEAUX before granting Jenkins' request, and BORDEAUX did not know Jenkins had sought approval to move into BORDEAUX's cell until Defendant BOWLES informed her that Jenkins had received approval and was moving in. When confronted about whether this was a good idea, Defendant BOWLES stated that "I have cousins, we beat each other up all the time and the next time we're friends again."

32.

Two or three days later, on September 29, 2016 at approximately 1400 hours, Jenkins assaulted BORDEAUX in the cell that they now shared. Jenkins used her fists and a padlock to assault BORDEAUX, assisted by another inmate, Priscilla Fields.

33.

Although BORDEAUX yelled for help, the DOES assigned to C-Wing in North Hall did not respond until after Jenkins had completed the assault, although DOES on information and belief should have performed a regular check during that time. When DOES later did come to the cell, they did not question Jenkins when Jenkins told them that BORDEAUX had just tripped over a tote, even though BORDEAUX was obviously injured.

34.

BORDEAUX was eventually taken to the hospital in York for medical evaluation. Radiologic imaging confirmed that she sustained facial trauma and defensive wounds, to include a fractured finger. BORDEAUX also sustained the emotional damage that would reasonably result from being helpless to stop a frightening assault by a violent and vengeful inmate whom BORDEAUX knew to be fully capable of murder (literally).

35.

Following the assault, BORDEAUX was placed in Protective Custody, while Jenkins and Fields went to the Restrictive Housing Unit. When BORDEAUX asked to be released from PC, Defendants refused, even though Jenkins and Fields were now housed in RHU.

36.

In PC, BORDEAUX received fewer privileges than Jenkins and Fields received in RHU. RHU inmates such as Jenkins and Fields were allowed access to programming and privileges (including church and exercise) that BORDEAUX requested and was denied in PC. Moreover, disruptive mentally ill inmates were housed in PC along with BORDEAUX, who was neither mentally ill nor disruptive; this resulted in BORDEAUX being forced to live surrounded by the sounds of agitated and disruptive mentally ill inmates throughout the day and night.

37.

And, Defendants continued to expose BORDEAUX to the threat of assault by Jenkins, which caused BORDEAUX continuing fear and anxiety. Jenkins was escorted without restraints and with a single officer from RHU to other locations in YCCW, and was on at least two occasions (four and five months after the assault) left alone within a few feet of BORDEAUX while BORDEAUX was out of her PC cell. Finally, BORDEAUX was transferred to a correctional facility in another state.

## FIRST CAUSE OF ACTION

## 42 U.S.C. § 1983

38.

BORDEAUX had a right under the United States Constitution to be free from excessive punishment and deliberate indifference to her safety, as well as a right to due process and equal protection, by employees of governmental entities.

39.

At all times relevant to this Complaint, Defendants were acting under color of law – under the constitutions, statutes, administrative rules, customs, policies and usages of YCCW, NDCS, the State of Nebraska and the United States – and Defendants had assumed the responsibilities, activities and rights involved in exercising their roles as members of NDCS' professional staff.

40.

Defendants acted with deliberate indifference to BORDEAUX's known and recognized constitutional and legal rights to be free from excessive punishment, to due process, to bodily integrity, and to be free from deliberate indifference to her safety. Defendants actively participated in the deprivation of BORDEAUX's constitutional rights by causing BORDEAUX's suffering, terror and injury. This includes, but is not limited to:

    a.    Defendants' placement of BORDEAUX into general population with Jenkins;

    b.    Defendants' placement of Jenkins in a cell with BORDEAUX;

    c.    Defendants' failure to institute measures to protect BORDEAUX from Jenkins, despite their actual knowledge of the direct risk to BORDEAUX's safety that Jenkins presented;

    d.    Defendants' unreasonable expectation that BORDEAUX could somehow protect herself from a murderous inmate against whom BORDEAUX had provided cooperative testimony;

  e.  Defendants' failure to intervene when Jenkins attached BORDEAUX; and

  f.  Defendants' continuing confinement of BORDEAUX in involuntary PC, post-assault, when BORDEAUX had not incited the assault and had committed no wrongdoing in the course of the assault.

41.

Defendants' conduct, within their duties as members of NDCS' administration and professional staff and under color of state law, deprived BORDEAUX of rights, privileges and immunities secured by the United States Constitution. Particularly, BORDEAUX was deprived of her constitutional interests in freedom from excessive punishment, due process, bodily integrity and freedom from deliberate indifference to her safety.

## SECOND CAUSE OF ACTION

## 42 U.S.C. § 1983

*Count I – Policy or custom of failing to protect inmate safety*

42.

Defendants had a special relationship with BORDEAUX, by virtue of the fact that Defendants had custody and control over BORDEAUX and knew BORDEAUX to be at unique risk of harm from other inmates due to her cooperation with law enforcement in the investigation of the Jenkins family murders. Due to her incarceration, BORDEAUX could take only limited measures for her own safety. DAVIDSON knew this, and further knew that each had a duty to exercise reasonable care in the selection, training, assignment, supervision and retention of its professional staff, including FOLTS, BICKNASE, GOLLADAY, BOWLES and DOES. This includes informal policies instituted by DAVIDSON, who had decisionmaking authority, to fail to provide appropriate housing and staffing to protect inmate safety.

43.

By those failures set forth above, DAVIDSON acted with deliberate indifference to a known risk of constitutional deprivation to BORDEAUX

44.

As a result of Defendants' deliberate indifference to the risk of deprivation of BORDEAUX's constitutional liberty interests, BORDEAUX incurred damages as set forth below.

45.

NDCS and YCCW, including DAVIDSON, had a widespread custom or practice of failing to supervise and tolerating misconduct by employees, to include:

a. Permission for staff to place high-risk inmates with known histories of violence in the correctional setting, such as Jenkins, in general population without restriction;

b. Permission for staff to place in the same housing units *and the same cell* an inmate whose conviction stemmed from cooperating witness testimony with the inmate who was that cooperating witness;

c. Permission for staff to skip scheduled checks, even when staff knew that an inmate whose conviction stemmed from cooperating witness testimony had been placed in a cell with the inmate who was that cooperating witness;

d. Permission for staff to effectively punish inmates who are victims of assault by other inmates via involuntary PC, resulting in the denial or greatly restricted access to privileges and programming; and

e. Permission for staff to continue to expose inmates who are victims of assaults by other inmates to the inmates who assaulted them, thereby increasing the victim's anxiety, fear and sense of helplessness.

BORDEAUX could not reasonably have discovered these customs and practices, including the failure to supervise and the tolerance of employee misconduct, because such knowledge was specifically held by officers and agents of Defendants.

*Count II – Failure to train*

46.

At all times relevant to this Complaint, DAVIDSON had a custom or practice of failing to train her employees to protect inmates who were cooperating witnesses from inmates against whom they had testified. DAVIDSON failed to implement training materials and programs related to recognizing and understanding increased risks and threats presented by exposing cooperating witness inmates to the inmates against whom they had testified.

47.

Such failures included, but are not limited to:

a. DAVIDSON's failure to train correctional staff to assign cooperating witness inmates to different housing units from the inmates against whom they had testified;

b. DAVIDSON's failure to train correctional staff to refuse a request to place inmates against whom a cooperating witness had testified in the same cell as the cooperating witness;

c. DAVIDSON's failure to train correctional staff that when they know of a clear risk of inmate assault, staff must act proactively rather than waiting for the prospective victim to either ask for protective custody or get assaulted;

d. DAVIDSON's failure to train correctional staff in the need to perform scheduled checks and immediately intervene when an inmate is being assaulted;

e. DAVIDSON's failure to train correctional staff that the victim of an inmate assault should not receive what is effectively punishment; and

f. DAVIDSON's failure to train correctional staff to not expose the victim of an inmate assault to her assaulters.

48.

By failing to train her employees as set forth above, DAVIDSON acted with deliberate indifference to a known risk of constitutional deprivation to BORDEAUX.

49.

As a result of Defendants' deliberate indifference to the risk of deprivation of BORDEAUX's

constitutional liberty interests set forth above, BORDEAUX has incurred damages as set forth below.

## PUNITIVE DAMAGES

50.

In addition to compensatory damages, BORDEAUX hereby makes a claim for punitive damages against defendants in an amount to be proven at trial for the willful and wanton acts and omissions of Defendants to include violation of BORDEAUX's civil rights, as alleged herein. The acts and omissions of Defendants in this case were so gross and culpable in nature that they constitute reckless indifference and wanton disregard for the law and for the lives and safety of others, including BORDEAUX. Defendants committed the acts and omissions alleged herein and subjected BORDEAUX to conscious physical and emotional harm. Defendants' actions should be punished, and an example should be made so that these actions and omissions are not repeated.

51.

This instance of reckless and callous indifference to BORDEAUX's safety and constitutional rights should be punished through the imposition of punitive damages so as to make an example of conduct that will not be tolerated.

## ATTORNEY'S FEES

52.

As a result of defendants' actions as alleged herein, BORDEAUX has been required to retain the services of attorneys and are entitled to a reasonable amount for attorney's fee pursuant to 42 U.S.C. § 1988 for those violations covered by the Civil Rights Act.

## DAMAGES

53.

The acts and omissions of Defendants as set forth above have resulted in BORDEAUX's

injury, terror, pain and suffering.  BORDEAUX thus seeks recovery for the following damages:

      A.    Compensatory damages in an amount to be proven at trial, for her injury and her physical and mental pain and suffering;

      B.    Compensatory damages for the violation of BORDEAUX's rights under the federal and state Constitutions;

      C.    Punitive damages to punish and deter the conduct alleged in this Complaint;

      D.    Attorney's fees; and

      E.    The costs of this action and such other and further relief as this Court deems equitable and proper.

**WHEREFORE,** Plaintiff prays for judgment against the defendants as follows:

A.    Plaintiff prays for damages in an amount which will fairly and justly compensate for CHRISTINE's physical and emotional injuries and the violation of CHRISTINE's civil rights, her pain and suffering and other consequential damages flowing from the violations and torts set forth herein;

B.    Punitive damages in an amount sufficient to adequately punish defendants and to deter future conduct of the type alleged in this Complaint;

C.    For attorney's fees pursuant to 42 U.S.C. § 1988; and

D.    For the costs of this action and for such other and further relief as this Court deems equitable and proper.

### JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

Plaintiff requests that this matter be tried to a jury in Lincoln, Nebraska.

CHRISTINE BORDEAUX, Plaintiff,

By:    /s/ *Maren Lynn Chaloupka*
    Maren Lynn Chaloupka – NSBA # 20864
Chaloupka Holyoke Snyder Chaloupka & Longoria, P.C., L.L.O.
1714 2nd Avenue
P.O. Box 2424
Scottsbluff, NE  69363-2424

Telephone: (308) 635-5000
Facsimile: (308) 635-8000
mlc@chhsclaw.net

-AND-

Gerald L. Soucie – NSBA # 16163
1141 H Street
P.O. Box 83104
Lincoln, NE 68501-3104
Telephone: (402) 429-2145
jerdog16163@windstream.net